**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DIVISION**

| | | |
|---|---|---|
| In Re: Dickinson of San Antonio, Inc. | § | |
| *Debtor,* | § | |
| | § | |
| Tango Delta Financial, Inc.; Cottingham | § | |
| Management Company, LLC; Cottingham | § | CASE NOS. 5:20-CV-00580-XR |
| Apex Texas Fund, LLC, | § | 5:19-CV-01237-XR |
| *Appellants,* | § | 5:19-CV-01238-XR |
| | § | |
| v. | § | BANKRUPTCY CASE NO. 16-52492- |
| | § | RBK |
| John Patrick Lowe, Chapter 7 Trustee for | § | |
| the Bankruptcy Estate of Dickinson of San | § | ADV. PROC. NO. 18-05259-RBK |
| Antonio, Inc., Dickinson of Austin, Inc., | § | |
| and Dickinson of Tulsa, Inc., | § | |
| *Appellee.* | § | |

**<u>ORDER</u>**

On this date, the Court considered the above-captioned appeals from the United States

Bankruptcy Court for the Western District of Texas.  The subject of these appeals is the Bankruptcy

Court's judgment granting partial relief to the plaintiff after a five-day trial. For the reasons stated

below, the Bankruptcy Court's judgment is **AFFIRMED**.

**BACKGROUND**

Dickinson of San Antonio, Inc. d/b/a Career Point ("Debtor"), formerly a for-profit college

for nurses, filed a voluntary petition in bankruptcy in the United States Bankruptcy Court for the

Western District of Texas on October 31, 2016 (Bankruptcy No. 16-52492-RBK). John Patrick

Lowe ("Trustee") was appointed to administer the Debtor's bankruptcy estate ("Bankruptcy

Estate").  On October 27, 2018, the Trustee brought suit in the Bankruptcy Court against Tango

Delta Financial, Inc. f/k/a American Student Financial Group, Inc. ("ASFG"), Cottingham

Management Company, LLC ("Cottingham Management"), and Cottingham Apex Texas Fund,

LLC ("Cottingham-Texas"), alleging various causes of action against each entity in a 29-count

1

complaint (Adversary Proceeding No. 18-05259-RBK). Counts 1, 2, and 3 of the complaint were brought solely against Cottingham-Texas and were disposed of on summary judgment.

The Bankruptcy Court held a trial on the remaining causes of action on January 27, 2020. On June 23, 2020, the Bankruptcy Court entered a Memorandum Decision denying relief on Counts 4, 5, 6, 7, 8, 9, 10, 11, 14, 15, 16, 17, 18, 22, 24, and 28. The court granted relief on Counts 12, 13, 19, 20, 21, 23, 25, 26, 27, and 29, listed below:

| Count | Cause of Action |
|---|---|
| 12 | Equitable Subordination of Claims under 11 U.S.C. § 510(c). |
| 13 | Avoidance of Lien under 11 U.S.C. § 544. |
| 19 | Avoidance of Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A). |
| 20 | Avoidance of Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B). |
| 21 | Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(1). |
| 23 | Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.006(a). |
| 25 | Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550. |
| 26 | Objection to Claim under 11 U.S.C. § 502. |
| 27 | Avoidance of Post-Petition Transfer under 11 U.S.C. § 549. |
| 29 | Recovery of Attorneys' Fees and Costs. |

At trial, the Trustee demanded repayment of over $8 million in Program Subsidy Loans ("PSLs") made by Debtor to Cottingham-Texas, sought to disallow a claim by ASFG for over $12 million based on Debtor's contractual obligations to repurchase certain student loans, and claimed that $5.1 million paid to ASFG under the loan-repurchase obligation constituted a fraudulent transfer and should be returned. Opinion of the Bankruptcy Court ("BC Op.") at 2.

2

## ISSUES ON APPEAL

ASFG asserts twenty-six issues on appeal, which fall into six general categories: (1) compliance with the Higher Education Act's 90/10 Rule, which provides that for-profit colleges can only obtain Title IV funding from the United States Department of Education ("DoE") if at least 10% of the college's funding comes from non-governmental sources[1] (Issues 1–8); (2) alleged fraud on the part of ASFG (Issues 9–11, 17–18); (3) the evidentiary support for Debtor's insolvency (Issues 12–14, 16); (4) the Bankruptcy Court's equitable subordination of ASFG's claim (Issues 20–22); (5) the Bankruptcy Court's judgment against ASFG and in favor of Trustee (Issues 23–24); and (6)  the Trustee's use of ASFG's collateral to obtain a judgment against Cottingham-Texas (Issues 25–26).  Specifically, ASFG raises the following issues:

1.  Did the Bankruptcy Court err in finding that the Program Subsidy Loans made under the Tuition Loan Program Agreement was a scheme to violate the U.S. Department of Education's 90/10 Rule?

2.  Did the Bankruptcy Court err in finding that 20 U.S.C. § 1094(d)(1)(F)(iv) "provides that any funds 'required to be refunded or returned' to the lender must be deducted from the school's '10' revenue calculation"?

3.  Did the Bankruptcy Court err in finding that "for the funds advanced through the Subsidized Loan Program to be counted as "10" revenue in compliance with the 90/10 Rule, the investment fund (in this case, Cottingham-Texas) was required to be arms-length and truly independent from ASFG"?

4.  Did the Bankruptcy Court err in finding that "[in] order to comply with the statute, the private student loan money could not be returned to the lender, ASFG, and also counted as "10" revenue"?

5.  Did the Bankruptcy Court err in finding that "For-profit schools operating under this Program could only count the funds loaned to Cottingham-Texas as '10' revenue if Cottingham-Texas invested that money at arm's length with banks, investment houses, or any investment other than ASFG"?

6.  Did the Bankruptcy Court err in finding that that Cottingham Apex Texas Fund, LLC ("Cottingham-Texas") was not independent from ASFG and that, without an

---

[1] *See* 20 U.S.C. § 1094(a)(24); *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1055 (11th Cir. 2015).

intermediary who is independent from the lender, the Debtor would be in violation of the 90/10 Rule?

7. Did the Bankruptcy Court err in admitting the opinion testimony of Cindy Shoffstall when it was clear from her testimony that she was not an expert with regard to the 90/10 Rule?

8. Did the Bankruptcy Court err in finding that Cindy Shoffstall "testified she would not have included CPC's investment in Cottingham-Texas in the 90/10 calculation had she been informed about the lending relationship between ASFG and Cottingham; she would have included it in the related party note in her audit of CPC"?

9. Did the Bankruptcy Court err in finding that the Debtor and ASFG entered into the TLPA and the APPA with the intent to defraud the Debtor's creditors?

10. Did the Bankruptcy Court err in finding that "Both CPC's principal, Lawrence Earle, and ASFG actively concealed that the payments to Cottingham-Texas were merely deposits placed with ASFG to secure its lending to CPC's students"?

11. Did the Bankruptcy Court err in finding that "ASFG 'concealed,' at least from federal reporting, that Cottingham-Texas was not independent"?

12. Did the Bankruptcy Court err in admitting the opinion testimony of Greg Murray with regard to the value of assets on the Debtor's financial statements when Mr. Murray testified that he has no expertise in valuation?

13. Did the Bankruptcy Court err in finding that the Debtor was insolvent based on the opinion testimony of an accountant who based his opinion on the Debtor's financial statements without any evidence of the fair value of the Debtor's assets?

14. Did the Bankruptcy Court err in finding that the Debtor was insolvent at each time that it purchased defaulted loans from ASFG?

15. Did the Bankruptcy Court err in finding that the U.S. Department of Education had a claim in the bankruptcy case that existed when the TLPA was entered into in 2013?

16. Did the Bankruptcy Court err in finding that the Debtor did not receive reasonably equivalent value for the defaulted loans that it purchased from ASFG?

17. Did the Bankruptcy Court err in finding that ASFG did not operate in good faith?

18. Did the Bankruptcy Court err in finding that ASFG did not receive the payments for the purchase of defaulted loans in good faith?

19. Did the Bankruptcy Court err in finding that "ASFG thus has $2.4 million more than it should under the TLPA and APPAs ($8.2 million - $5.8 million = $2.4 million)"?

20. Did the Bankruptcy Court err in construing section 15.1.7 of the TLPA to include a representation and warranty that ASFG would not be in a lending relationship with Cottingham-Texas when (1) the Bankruptcy Court made a factual finding that CPC's principal knew that the funds it loaned to Cottingham-Texas through the Program Subsidy Loans would be loaned by Cottingham-Texas to ASFG, (2) Cottingham-Texas was formed at the request of CPC's attorney for the sole purpose of receiving the Program Subsidy Loans from CPC and loaning the funds to ASFG, and (3) in section 5.1 of the TLPA, the parties jointly acknowledged that one of the purposes of the Program Subsidy Investment by CPC was to subsidize "the capital costs to be incurred by ASFG to originate, make and hold ASFG Tuition Loans and to purchase and hold Bank Tuition Loans"?

21. Did the Bankruptcy Court err in finding that a breach of the warranty in section 15.1.7 of the TLPA excused the performance of the Debtor under the TLPA and the APPAs?

22. Did the Bankruptcy Court err in finding that ASFG engaged in inequitable conduct sufficient to justify equitably subordinating its claim?

23. Did the Bankruptcy Court err in disallowing ASFG's claim under Bankruptcy Code 502(d)?

24. Did the Bankruptcy Court err in entering judgment in favor of Plaintiff?

25. With regard to Appeal No. 5:19-CV-01237, did the Bankruptcy Court err in allowing the bankruptcy trustee to use ASFG's collateral (the master promissory notes) to first obtain a judgment against Cottingham-Texas and then obtain a writ of garnishment and ultimately a judgment against ASFG when ASFG had property rights under non-bankruptcy law to foreclose on the master promissory notes and to offset its liability to Cottingham-Texas?

26. With regard to Appeal No. 5:19-CV-01238, did the Bankruptcy Court err in denying ASFG's request for adequate protection of its collateral?

ECF No. 18 at 1–3. Though listed as issues, ASFG does not substantively argue in support of Issues 15 and 19 in its briefing. This Court addresses ASFGs arguments below.

## STANDARD OF REVIEW

A district court has jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges entered in cases and proceedings referred to bankruptcy judges. *See* 28 U.S.C. § 158(a). On appeal, a bankruptcy judge's conclusions of law are reviewed *de novo*, whereas findings of fact will not be set aside unless they are found to be clearly erroneous. *In re National Gypsum Co.*, 208 F.3d 498, 503 (5th Cir. 2000). The district court reviews mixed questions of law and fact *de novo*. *Id.*

The court reviews discretionary decisions of the bankruptcy court for abuse of discretion. *See Mendoza v. Temple-Inland Mortgage Corp. (In re Mendoza)*, 111 F.3d 1264, 1270 (5th Cir. 1997). A bankruptcy court abuses its discretion when "its ruling is based on an erroneous review of the law or on a clearly erroneous assessment of the evidence." *In re Yorkshire, LLC*, 540 F.3d 328, 331 (5th Cir. 2008) (quoting *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir.1995)).

## ANALYSIS

**A. The Bankruptcy Court's ruling that the Program Subsidy Loans made under the Tuition Loan Program Agreement and Account Program Purchase Agreement violated the U.S. Department of Education's 90/10 Rule is affirmed. (Issues 1–8)**

For-profit colleges are governed by Title IV of the Higher Education Act of 1965. This Act authorizes the federal government to operate programs that distribute funds to students and higher education institutions with the goal of reducing the cost burden on individuals. *See* 20 U.S.C. §§ 1070–1099d. To be eligible to receive Title IV funds, a private, for-profit college like Debtor must "derive not less than ten percent of [its] revenues from sources other than funds provided" by the government ("the 90/10 Rule"). 20 U.S.C. § 1094(a)(24). A qualifying college must enter into a program participation agreement with the DoE and promise to comply with all federal statutes applicable to Title IV. *See* 20 U.S.C. § 1094; 34 C.F.R. § 668.14(b)(1). A student attending or

planning to attend a qualifying college engaged in such an agreement may then apply to receive Title IV funds by completing the Free Application for Federal Student Aid.

The Bankruptcy Court found that Debtor and ASFG were engaged in a scheme that was designed to violate the 90/10 Rule. Under what the court called the "Deposit Program," ASFG offered originating student loans in an agreement requiring the school to place a percentage of the funds received as a deposit with ASFG. Under the "Letter of Credit Program," it offered originating student loans and required the school to deposit a percentage of the funds with a third-party bank, which would then issue a letter of credit back to ASFG. Under the "Subsidized Loan Program," ASFG would lend money to a school, which would then deposit a percentage of the funds with an alleged third-party investment fund. BC Op. at 5. The court found that no for-profit college could count the amount deposited with ASFG under the Deposit Program toward the ten percent private funding required by the 90/10 Rule. Contrarily, it found that a college engaged in the Letter of Credit Program *could* count its revenue toward the 90/10 Rule and that the PSLs—the funds advanced through the Subsidized Loan Program—could be counted as private revenue under the 90/10 Rule only if the investment fund was truly independent from ASFG. In other words, student loan money could not be returned to ASFG and be counted as private revenue. *Id.* at 6.

In 2013, ASFG, Debtor, and Debtor's parent company Edudyne Systems, Inc. ("Edudyne") entered into a Tuition Loan Program Agreement ("TLPA") under which ASFG would provide student loans to Debtor's students. BC Op. at 7. The TLPA provided that ASFG would forward proceeds from student loans to Debtor, which would then forward half of those proceeds to Cottingham-Texas in the form of a "loan" that would be repaid with interest. Rather than repaying the loan, however, as required under the TLPA and the related Master Promissory Note,

Cottingham-Texas returned 100% of the money it "borrowed" from Debtor to ASFG. *Id*. Neither the TLPA nor the Master Promissory Note, which controlled the Debtor-to-Cottingham-Texas portion of the transaction, documented this final step of the scheme. *Id*.

In 2015, ASFG and Debtor entered into the Account Program Purchase Agreement ("APPA"). This agreement altered the transactional relationship between the parties. Prior to this agreement, ASFG would issue loans to students directly. After it, Debtor would enter into Retail Installment Contracts ("RICs") with students and sell the RICs to ASFG at face value. BC Op. at 9. The parties then proceeded with the same series of transfers contemplated by the 2013 TLPA. That is, ASFG collected the payments on the RICs from students and sent the proceeds to Debtor, which "loaned" half of the proceeds to Cottingham-Texas, which deposited the monies with ASFG.[2]

ASFG argues that the Bankruptcy Court erred in finding that the PSLs were a scheme to skirt the 90/10 Rule. ECF No. 18 at 26. It contends that there is no statute, regulation, or case supporting the court's conclusion that the investment fund—here, Cottingham-Texas—needed to be "arms-length and truly independent from ASFG." *Id*. at 27–28 (citing ECF 9-14 at 22).[3] That is, there is no requirement that funds returned to a lender cannot be counted as "10" revenue under the 90/10 Rule. *Id*. at 28. It asserts that 20 U.S.C. § 1094(d)(1)(F)(iv), which the Bankruptcy Court cited in support of its holding only applies to funds "provided by the institution for a program

---

[2]     From this point, references to the schemes described by the TLPA and APPA will be referred to generally as the "Loan Scheme."

[3]     ASFG argues in a footnote that Cottingham-Texas and ASFG were, in fact, independent from one another. *Id*. This Court finds that assertion dubious at best. As noted in its prior order affirming summary judgment against Cottingham-Texas on Counts 1–3, it is difficult to believe that ASFG and Cottingham-Texas are truly independent when the two entities share the same counsel, present the same arguments despite having potentially adverse positions, commingled funds, and only operate to carry out the three-party scheme outlined in the TLPA and APPA. Additionally, ASFG paid Cottingham-Texas's LLC filing fees and has unity of ownership with Cottingham Management, LLC, Cottingham-Texas's sole member.

under [Title IV]," and thus not applicable to loans from private lenders, such as the PSLs. *Id.* at 28–29.

According to ASFG, when a for-profit college makes a tuition loan to a student, it may include in its 10% calculation only the amount recovered in loan repayments during the applicable fiscal year. And when a third-party lender makes the loan, the school can include the entire amount in its 10% calculation because it has received the entire amount during that fiscal year. *Id.* at 31. But the calculation is slightly more complex with regard to loans such as the PSLs. When a college guaranties a third-party student loan with an agreement to repurchase loans that go into default (known as a "recourse obligation"), the college may include revenues received from such loans as long as the amount reported is reduced by the amount of any payments made to the third-party lender in connection with its recourse obligations during that fiscal year. *Id.* at 32–33 (citing Tr. Ex. 59, p. 2-85 (DoE Student Aid Handbook); Tr. Ex. 60, p. 30 (DoE Audit Guide)).

In support of its contention that the Loan Scheme did not violate the 90/10 Rule, ASFG describes multiple safeguards within the TLPA and APPA designed to ensure that the PSL payments were properly construed as 10% revenue. ASFG describes this scheme as "the difference between 'tax avoidance' and 'tax evasion.'" *Id.* at 38.

The Trustee responds that ASFG misstates the Bankruptcy Court's holding. It asserts that the court did not hold that the Loan Scheme actually violated the 90/10 Rule, but that it was intended to evade or circumvent the rule. This distinction matters because the former involves a conclusion of law whereas the latter constitutes a finding of fact, requiring a "clearly erroneous" standard of review on appeal. ECF No. 21 at 35. That is, a party's *intent* to violate a statutory regime may have some bearing on a court's understanding of a fraudulent transfer even where the transfer itself was not actually illegal. *Id.* at 36 (citing *In re EBC I, Inc.*, 356 B.R. 631, 640 (Bankr.

D. Del. 2006) ("'Whether the transfer . . . was legal or not is irrelevant for the purposes of § 548.'")).

The Trustee then argues that the Bankruptcy Court's finding that ASFG *intended* to circumvent the 90/10 Rule was not erroneous. First, ASFG's characterization of the scheme as "tax avoidance" rather than "tax evasion" demonstrates its intent to avoid the Rule. *Id*. at 36. Second, the evidence elicited at trial supports the Bankruptcy Court's finding. ASFG's COO, Kevin Jasper, testified that direct return of the collateralized funds to ASFG would have to be deducted from the 10% revenue, whereas the indirect return of the monies contemplated by the Loan Scheme was believed to avoid that revenue deduction. *Id*. at 37 (citing ECF 14-4 at 156:13–18). Likewise, Timothy Duoos, ASFG's principal and sole director, testified that ASFG concocted the Loan Scheme "in order to help solve some of the[] 90-10 . . . requirements." *Id*. at 38 (quoting ECF 14-3 at 110:14–19; also citing ECF 14-3 at 108:12–109:7 and T-Ex.48 at §§ B-C). However, both Jasper and Duoos acknowledge that the TLPA did not disclose to Debtor that the funds received by Cottingham-Texas would be loaned back to ASFG. *Id*. at 39 (citing ECF 14-4 at 174:20; ECF 14-3 at 146:16–149:12). In fact, Cottingham-Texas had no revenue other than the funds borrowed from Debtor. *Id*. at 40 (citing ECF 14-4 at 160:24–161:24).

The Bankruptcy Court found that neither the TLPA nor the APPA fully disclosed the relationship between ASFG and Cottingham-Texas. BC Op. at 21, 24; *see also* ECF No. 14-4 at 174:20; ECF No. 14-3 at 146:16–149:12. Instead, it found that Debtor's principal, Lawrence Earle, and ASFG concealed the scheme by which monies received by Cottingham-Texas from Debtor— who itself received payments from ASFG—were deposited back to ASFG in order to secure its lending to Debtor's students. *Id*.

**a. Issue 1**

10

This Court finds that the Bankruptcy Court did not err in finding that the PSLs made under the TLPA were part of a scheme to violate the U.S. Department of Education's 90/10 Rule. First, the Court agrees with the Trustee that the existence of a scheme is a question of fact for the factfinder to decide—here, the Bankruptcy Court. The existence of a scheme is a question of fact, but whether the scheme was illegal is a question of law. Questions of fact are reviewed on a clearly erroneous standard. *In re National Gypsum Co.*, 208 F.3d at 503. Under this standard, the Bankruptcy Court's finding must be affirmed as long as there is a plausible basis for the finding in the trial record. "If the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, *N.C.*, 470 U.S. 564, 573–74 (1985).

A plausible basis exists. Stephen Bick, who managed Cottingham-Texas, testified at trial that ASFG created the Loan Scheme solely to evade punishment for failing to comply with the DoE's 90/10 Rule. *See* ECF No. 14-3 at 77:20–78:21. Under that scheme, ASFG transferred $16,800,000 to Debtor to satisfy its obligations under the TLPA and APPA. Debtor transferred half that amount—$8,400,000—to Cottingham-Texas, all of which was then returned to ASFG. BC Op. at 10. Kevin Jasper, ASFG's COO, testified that this was the Loan Scheme's purpose. ECF 14-4 at 163:10–165:17; *see also* ECF No. 14-3 at 130:17; Trial Exhibit 48 §§ B-C. ASFG controlled Cottingham-Texas's investment policies and never permitted it to invest those monies anywhere other than with ASFG. Further, even though that 50% was supposed to constitute a loan to be eventually repaid to Debtor, Cottingham-Texas never had sufficient liquidity to satisfy that repayment. *See* ECF No. 14-3 at 98:1–3. The Bankruptcy Court relied on Mr. Bick's and Mr. Jasper's testimony in finding that Cottingham-Texas was a straw man used to help ASFG skirt the

90/10 Rule. BC Op. at 11. The Court is convinced that this finding was not clearly erroneous and affirms on this issue.

### b. Issues 2–6

Issues 2 through 6 all ask the Court to determine whether counting the funds returned to ASFG through Cottingham-Texas as "10" revenue actually violated the 90/10 Rule. These issues are questions of law that must be reviewed *de novo*. The issues presented are:

2. Did the Bankruptcy Court err in finding that 20 U.S.C. § 1094(d)(1)(F)(iv) "provides that any funds 'required to be refunded or returned' to the lender must be deducted from the school's '10' revenue calculation"?

3. Did the Bankruptcy Court err in finding that "for the funds advanced through the Subsidized Loan Program to be counted as "10" revenue in compliance with the 90/10 Rule, the investment fund (in this case, Cottingham-Texas) was required to be arms-length and truly independent from ASFG"?

4. Did the Bankruptcy Court err in finding that "[in] order to comply with the statute, the private student loan money could not be returned to the lender, ASFG, and also counted as "10" revenue"?

5. Did the Bankruptcy Court err in finding that "For-profit schools operating under this Program could only count the funds loaned to Cottingham-Texas as '10' revenue if Cottingham-Texas invested that money at arm's length with banks, investment houses, or any investment other than ASFG"?

6. Did the Bankruptcy Court err in finding that that Cottingham Apex Texas Fund, LLC ("Cottingham-Texas") was not independent from ASFG and that, without an intermediary who is independent from the lender, the Debtor would be in violation of the 90/10 Rule?

20 U.S.C. § 1094(d)(1)(F)(iv) states that an institution receiving Title IV funds must exclude from its accounting of privately sourced revenues (the denominator in the 90/10 calculation) "the amount of funds provided by the institution for a program under this subchapter that are required to be refunded or returned." The Bankruptcy Court held that private student loan monies advanced to Debtor through the Subsidized Loan Program "could not be returned to the lender, ASFG, and also counted as '10' revenue. For-profit schools operating under this Program

could only count the funds loaned to Cottingham-Texas as '10' revenue if Cottingham-Texas invested that money at arm's length with banks, investment houses, or any investment other than ASFG." BC Op. at 6.

ASFG argues that § 1094(d)(1)(F)(iv) is inapplicable to the case at bar and does not support the Bankruptcy Court's conclusion. It asserts that the language "this subchapter"[4] renders that provision applicable only to funds provided to Debtor for a program under Title IV. ECF No. 18 at 29–30. That is, it is inapplicable to loans from private lenders. According to ASFG, 34 C.F.R. § 668.28, the implementing regulation of that statute, makes clear that a for-profit college must exclude from its denominator calculation only those funds returned to the DoE after a student withdraws from the institution during a payment period. *Id*. at 30.

More generally, ASFG argues that the Program Subsidy Loan structure was designed to comply with the 90/10 Rule. *Id*. at 31. Because recourse loan obligations are not directly addressed in 20 U.S.C. § 1094, ASFG relies on the DoE's Federal Student Aid Handbook and the DoE Guide for Audits of Proprietary Schools in stating that payments must be deducted from the 90/10 denominator only when payments are (1) made under a recourse loan and (2) made specifically to the noteholder. *Id*. at 34. According to ASFG, the PSLs were not recourse loan payments made to recourse loan holders. *Id*. at 34–36.

The Trustee counters that § 1094(d)(1)(F)(iv) does apply here because Cottingham-Texas was a strawman designed to funnel money to ASFG. ECF No. 21 at 43. It asserts that the DoE's guidelines discussing § 1094 and 34 C.F.R. § 668.28 advise that *all* recourse loans need to be carefully accounted for in order to avoid a violation. *Id*. at 43–44 (citing T-Ex. 59 at 12). But even assuming, as ASFG argues, that DoE regulations only require the deduction of monies paid in

---

[4] ASFG's citation uses "this title," but the meaning is the same.

connection with a recourse obligation where the payments are made to a *noteholder*, the Trustee asserts that the requirement is met here. *Id*. at 44. That is, the PSLs were still payments to the noteholder—ASFG, as the holder of the loans to Debtor's students—even if they were "laundered through a 'third party intermediary.'" *Id*. Likewise, the PSLs were recourse loan payments because, in the event that Debtor failed to comply with its recourse loan obligations, ASFG could foreclose on its collateral with Cottingham-Texas and retain the 50% it received as a loan. *Id*. at 45–46.

The Bankruptcy Court's opinion is upheld as to these issues. First, ASFG's own evidence cuts against its argument. The Student Aid Handbook states:

> Loans made by a private lender that are in any manner guaranteed by the school are known as recourse loans. The proceeds from recourse loans may be included in the denominator of an institution's 90/10 calculation for the fiscal year in which the revenues were received, provided that the institution's reported revenues are also reduced by the amount of recourse loan payments made to recourse loan holders during that fiscal year.

Tr. Ex. 59 at 2–85. The use of the broad "in any manner" support a finding that the PSLs are recourse loan payments made to a recourse loan holder. The Bankruptcy Court made a factual finding that monies were passed from Debtor to ASFG indirectly through Cottingham-Texas. The use of a strawman to facilitate payments does not inherently change the nature of the transfer. A payment from person A to person C is still a payment if it is momentarily handed to Person B as a middleman.

The Guide for Audits states:

> If the school sells loans or accounts receivable under a recourse agreement, ensure that the loans sold have not been previously counted in the 90/10 calculation (for example, when the school used the net present value). For any loans or accounts receivable sold that are repurchased under a recourse agreement, ensure that the school subtracted the payment from non-Title IV cash.

14

Tr. Ex. 60 at 30. These guidance statements are not mutually exclusive. Even though the proceeds from a recourse loan may sometimes be included in the 90/10 denominator does not mean that it may always be included. The Guide for Audits makes clear that loans or accounts receivable sold that are repurchased under a recourse agreement must be subtracted from the 90/10 denominator. This Court interprets the guidance statements as placing the payments made here within the penumbra of 20 U.S.C. § 1094(d)(1)(F)(iv).

ASFG's only argument that the PSL payments were not payments made to recourse loan holders is that it purposely used an intermediary, Cottingham-Texas, to insulate ASFG and Debtor from 90/10 scrutiny. ECF No. 18 at 35. But as discussed, Cottingham-Texas was an entity created and controlled by ASFG. It defies logic to believe that an improper transaction somehow becomes proper merely because a conduit entity is used as a middleman. The Bankruptcy Court's opinion is affirmed as to Issues 2 through 6.

### c.  Issues 7 and 8

Issues 7 and 8 relate to the testimony of Cindy Shoffstall. The issues presented are:

7.      Did the Bankruptcy Court err in admitting the opinion testimony of Cindy Shoffstall when it was clear from her testimony that she was not an expert with regard to the 90/10 Rule?

8.      Did the Bankruptcy Court err in finding that Cindy Shoffstall "testified she would not have included CPC's investment in Cottingham-Texas in the 90/10 calculation had she been informed about the lending relationship between ASFG and Cottingham; she would have included it in the related party note in her audit of CPC"?

ASFG first argues that the Bankruptcy Court improperly admitted the testimony of Cindy Shoffstall because she is not an expert in the 90/10 Rule. ECF No. 18 at 38–39. Ms. Shoffstall was Debtor's accountant and prepared its audited financial statements and 90/10 compliance reports. Debtor's counsel asked Ms. Shoffstall at trial to opine on hypothetical scenarios that resembled

the payments made from Cottingham-Texas to ASFG. However, she was not tendered as an expert witness and therefore unable to give opinion testimony in this manner. *Id*. at 39–40 (citing FED. R. EVID. 701). According to ASFG, Ms. Shoffstall's opinion testimony was not rationally based on her own perception because she did not have knowledge of the loans from Cottingham-Texas to ASFG, was not helpful to the factfinder's clear understanding of her testimony or a fact in issue, and was not based on scientific, technical, or specialized knowledge within the scope of Federal Rule of Evidence 702. *Id*. at 40. Further, she was not disclosed as an expert witness as required by Federal Rule of Civil Procedure 26.

The Trustee counters that the Bankruptcy Court's admission of Ms. Shoffstall's testimony was not an abuse of discretion because lay witnesses may testify as to the impact of false information. ECF No. 21 at 48. According to the Trustee, Ms. Shoffstall "had adequate factual knowledge to testify as a lay witness about her own perception of the audits and whether, had she known more, her analysis would have been different under the 90/10 Rule." *Id*. at 49 (citing ECF 14-3 at 176:4–21). That is, this testimony meets the requirements of Federal Rule of Evidence 701 because it is (1) based on the witness's knowledge and perception as an accountant; (2) assisted the factfinder; and (3) was not based on specialized knowledge. *Id*. at 50.

Federal Rule of Evidence 602 allows the admission of fact testimony as long as the witness has personal knowledge of the matter their testimony concerns. FED. R. EVID. 602. Opinion testimony may come from either a lay witness or an expert witness. *See* FED. R. EVID. 701 and 702. Rule 701 limits lay witness testimony to "those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Otherwise, "any part of a witness's opinion

that rests on scientific, technical, or specialized knowledge must be determined by reference to Rule 702, not Rule 701." *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008). The "distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" *Id*. (quoting FED. R. EVID. 701, advisory committee's note to 2000 amendments).

Here, the Bankruptcy Court admitted Ms. Shoffstall's testimony that she was misled by Lawrence Earle about the scope of the relationship between Cottingham-Texas and ASFG. Aside from her factual testimony as to Mr. Earle's misrepresentations, *see* BC Op. at 4, 10, Ms. Shoffstall's opinion testimony appears only once in the Bankruptcy Court's order, which notes that "she would not have included CPC's investment in Cottingham-Texas in the 90/10 calculation had she been informed about the lending relationship between ASFG and Cottingham; she would have included it in the related party note in her audit of CPC." *Id.* at 12.

Courts sitting in review of evidentiary rulings apply the deferential abuse-of-discretion standard. *Johnson v. Thibodaux City*, 887 F.3d 726, 736 (5th Cir. 2018); *Koch v. United States*, 857 F.3d 267, 277 (5th Cir. 2017). The "discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous." *Id*. (internal citations and quotations omitted). Nothing in Rule 701 prevents a lay witness from testifying about what another person told her. Likewise, nothing in Rule 701 prevents a lay witness from testifying about what she did and why she did it. The question, then, is whether the Bankruptcy Court erred in admitting the testimony about what Ms. Shoffstall would have done if the true nature of the PSL scheme was known to her at the time she conducted the internal 90/10 Rule audits.

At trial, Ms. Shoffstall testified that she included in the non-Title IV amount of the 90/10 calculation all of the funds that Debtor received from ASFG and deducted none of the 50 percent deposit that was sent to Cottingham-Texas. This is not challenged. She was then asked, "If Mr. Earle had told you that [Cottingham-Texas][5] had handed those 50 percent deposits over to ASFG, would you have included that amount in the ten piece of the calculation?" After an objection, she answered "I would not have included that. . . . Because the money was back into ASFG's hands." ECF No. 14-3 at 178. ASFG challenges this and similar hypotheticals posed to Ms. Shoffstall at trial.

Although this Court found no Fifth Circuit cases directly on point, the Fifth Circuit has permitted testimony elicited from lay witnesses based on hypothetical questions posed at trial under similar circumstances. *See United States v. Breland*, 366 F. App'x 548, 553 (5th Cir. 2010) (affirming the admission of hypothetical opinion testimony under Rule 701 when challenged on appeal but not objected to at trial). However, many circuits have addressed "what-if-you-had-known" questions and found such hypotheticals posed to lay witnesses are permissible under the Federal Rules of Evidence. *See, e.g*., *United States v. Cuti*, 720 F.3d 453, 459 (2d Cir. 2013); *United States v. Orr*, 692 F.3d 1079, 1096–97 (10th Cir. 2012); *United States v. Laurienti*, 611 F.3d 530, 549 (9th Cir. 2010); *United States v. Jennings*, 487 F.3d 564, 582 (8th Cir. 2007); *United States v. Ranney*, 719 F.2d 1183, 1187–88 (1st Cir. 1983); *United States v. Bush*, 522 F.2d 641, 649–50 (7th Cir. 1975).

Like these courts, this Court finds that the challenged testimony was permissible lay opinion under Rule 701. It appears from the transcript that Ms. Shoffstall was testifying on how

---

[5] The transcript originally references ASFG here. However, the Court is confident that this was a misstatement and that the proper object of the question should have been Cottingham-Texas. This is because the prior question asked, "Did you make any deductions for the 50 percent deposit that was given to Cottingham?" Ms. Shoffstall answered "No." ECF No. 14-3 at 178.

her thought process would have changed if she had known facts that were previously elicited at trial and accepted by the Bankruptcy Court, *i.e.*, that Cottingham-Texas was merely a conduit designed to circumvent the 90/10 Rule. Ms. Shoffstall's opinion that she would have altered her accounting calculations had she known these facts is clearly helpful to the trier of fact within the meaning of Rule 701(b). Her testimony was not "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." The type of counterfactual that Ms. Shoffstall was asked to perform is the same type of reasoning that "results from a process of reasoning familiar in everyday life." FED. R. EVID. 701 advisory committee's note, 2000 amendment. The Court affirms on this issue.

ASFG next argues that Ms. Shoffstall's testimony did not support the Bankruptcy Court's findings. ECF No. 18 at 49–50. It takes specific umbrage with the Bankruptcy Court's finding that Ms. Shoffstall would not have included Debtor's investment with Cottingham-Texas in the denominator of the 90/10 calculation if she had known about the lending relationship between Cottingham-Texas and ASFG. *Id*. It asserts that this is not what Ms. Shoffstall said at trial. Instead, ASFG argues that the omission of "the crucial fact that the money was *loaned* by Cottingham-Texas to ASFG" removes the evidentiary foundation necessary to support the Bankruptcy Court's finding.

This particular issue constitutes a finding of fact that the Court can only overrule if it is clearly erroneous. *In re National Gypsum Co*., 208 F.3d at 503. "The court owes even greater deference to findings based on the credibility of witnesses and must uphold them if based on coherent, internally consistent, and facially plausible testimony that is not contradicted by external evidence." *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 259 (5th Cir. 2006) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)).

The Court finds that the Bankruptcy Court's ruling was not clearly erroneous. As stated above, Ms. Shoffstall testified that she would have deducted the funds that Debtor gave to Cottingham-Texas from the 90/10 denominator if she had known that Cottingham-Texas gave those funds to ASFG. *See e.g.*, ECF No. 14-3 at 178. Even if this Court accepted ASFG's premise—that the fact that Cottingham-Texas's transfer to ASFG was a "loan" was the essential missing element in Ms. Shoffstall's testimony—other findings fill this purported void.

The Bankruptcy Court found that Lawrence Earle and ASFG "actively concealed that the payments to Cottingham-Texas were merely deposits placed with ASFG to secure its lending to CPC's students." BC Op. at 10. It went so far as to hold that "Cottingham-Texas was a straw man because it was used by Cottingham Management and ASFG to do something otherwise impermissible—to help ASFG and [Debtor] skirt the 90/10 Rule." *Id*. at 11. Simply put, it found that the loans were not real:

> The monies received by Cottingham-Texas from [Debtor] were returned directly to ASFG. Cottingham-Texas never had sufficient cash on hand to satisfy its obligations to [Debtor] under the [Master Promissory Notes]. ASFG was in control of the cash flow of Cottingham-Texas during the entirety of the relevant period. ASFG controlled Cottingham-Texas's investment policies. The unwritten agreement was that Cottingham-Texas would only "invest" its monies with ASFG. According to Stephen Bick, "that was the deal." No other alternative was ever considered.

*Id*. at 11–12. If the "loans" were not real loans, it is irrelevant whether Ms. Shoffstall knew or did not know that ASFG and Cottingham-Texas referred to them as loans.

"If the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson*, 470 U.S. at 573–74. Viewing the record in its entirety, the Court is satisfied that the Bankruptcy Court's finding of fact was not clearly erroneous.

For the reasons stated above, the Court affirms on Issues 7 and 8.

**B. The Bankruptcy Court's rulings relating to its equitable subordination of ASFG's claims are affirmed. (Issues 20–22).**

The relevant issues presented on appeal are:

20.   Did the Bankruptcy Court err in construing section 15.1.7 of the TLPA to include a representation and warranty that ASFG would not be in a lending relationship with Cottingham-Texas when (1) the Bankruptcy Court made a factual finding that CPC's principal knew that the funds it loaned to Cottingham-Texas through the Program Subsidy Loans would be loaned by Cottingham-Texas to ASFG, (2) Cottingham-Texas was formed at the request of CPC's attorney for the sole purpose of receiving the Program Subsidy Loans from CPC and loaning the funds to ASFG, and (3) in section 5.1 of the TLPA, the parties jointly acknowledged that one of the purposes of the Program Subsidy Investment by CPC was to subsidize "the capital costs to be incurred by ASFG to originate, make and hold ASFG Tuition Loans and to purchase and hold Bank Tuition Loans"?

21.   Did the Bankruptcy Court err in finding that a breach of the warranty in section 15.1.7 of the TLPA excused the performance of the Debtor under the TLPA and the APPAs?

22.   Did the Bankruptcy Court err in finding that ASFG engaged in inequitable conduct sufficient to justify equitably subordinating its claim?

The authority to equitably subordinate bankruptcy claims derives from 11 U.S.C. § 510(c). The requirements that guide courts in the application of the equitable subordination remedy comes from caselaw. To equitably subordinate a claim, a bankruptcy court must make three findings: (1) that the claimant engaged in inequitable conduct; (2) that the misconduct resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) that equitable subordination of the claim would not be inconsistent with the provisions of the Bankruptcy Code. *In re SI Restructuring, Inc*., 532 F.3d 355, 360 (5th Cir. 2008).

ASFG argues that the Bankruptcy Court erred when it found three instances of inequitable conduct supporting its decision to equitably subordinate ASFG's claim against the Bankruptcy Estate. The disputed findings are that "(1) ASFG breached its representation that it was not

affiliated with Cottingham-Texas, which indirectly caused the Debtor to fall out of compliance with the 90/10 rule, (2) ASFG did not keep Cottingham-Texas solvent and diverted funds from the Debtor as it approached bankruptcy, and (3) ASFG held onto millions of dollars in cash – proceeds of the Program Subsidy Loans and loan repurchase obligations – yielding a nearly 150% recovery on defaulted student loans, and on the whole program once it declared a Program Default."

Each are addressed in turn.

### a. The Non-Affiliation Representation

The TLPA contains the following provisions:

> 15.1 Representations, Warranties and Covenants of ASFG. As of the Effective Date, and as of the date ASFG sells and conveys each Defaulted Loan, Interest Reduced Loan and Designated Loan to Client hereunder, ASFG represents, warrants and covenants to Client as follows: . . .

> 15.1.7 Neither Investment Fund nor its manager, Cottingham Management, LLC, are, directly or indirectly, related to or affiliated with ASFG by any common legal or beneficial ownership, common management personnel, or in any other manner. There are no common owners (directly or indirectly), officers, directors, principals or managers between ASFG on one side, and Investment Fund and its manager on the other side. ASFG is an obligor to an affiliated company of Cottingham Management, LLC, under a debt instrument issued by ASFG.

ECF No. 21 at 245, 261. The TLPA further defines "affiliated" as "with respect to any specified party, any other entity controlling or controlled by or under common control with such specified party. For the purposes of this definition, the term "control" (including, with correlative meanings, "controlling", "controlled by", and "under common control with") means the power to direct or cause the direction of the management and policies of such entity." The Bankruptcy Court ruled that ASFG breached the representations contained within these provisions because it did in fact control Cottingham-Texas and was therefore affiliated with it. BC Op. at 21, 24.

ASFG argues that it did not breach its representation to Debtor that it was not affiliated with Cottingham-Texas. That is, it asserts that it is logically inconsistent of the Bankruptcy Court

to find on the one hand that Lawrence Earle, Debtor's CEO, knew about the structure and purpose of Cottingham-Texas as a pass-through entity and on the other hand that ASFG misrepresented to Debtor whether a lending relationship existed between ASFG and Cottingham-Texas. ECF No. 18 at 52–53. It further argues that it disclosed that "ASFG is an Obligor to an affiliated Company of Cottingham Management, LLC," *id* at 53 (citing ECF 9-10, p. 371, Stipulated fact 26, Exhibit 1, section 15.1.7.), and that "[t]he loans from Cottingham-Texas to ASFG did not occur until after the TLPA was signed," *id* at 53, so it should not be considered a breach to not disclose the lending relationship.

After noting that ASFG does not challenge the Bankruptcy Court's finding that it breached a similar provision in the APPAs, the Trustee responds that ASFG reaffirmed the TLPA's non-affiliation representation to Debtor each time Debtor made a recourse payment to ASFG. ECF No. 21 at 56. Even if the lending relationship did not technically exist at the time of the TLPA's execution, it began shortly thereafter in June 2013. *Id*. Further, the breach was not failing to disclose the lending relationship, but not disclosing that ASFG was in control of Cottingham-Texas. *Id.* at 56–59. Finally, the Trustee asserts that whether Mr. Earle knew about the lending relationship is not the same as Debtor knowing about the extent of the control that ASFG[6] exercised over Cottingham-Texas. *Id*. at 59.

In general, courts apply the abuse-of-discretion standard when reviewing the imposition of an equitable remedy. *See United States v. Durham*, 86 F.3d 70, 72 (5th Cir. 1996); *S.E.C. v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001); *S.E.C. v. Great White Marine & Recreation, Inc.*, 428 F.3d 553, 556 (5th Cir. 2005). Equitable subordination is one such remedy. *See In re SI*

---

[6] Debtor points out that Cindy Shoffstall, "[Debtor's] accountant who audited for regulatory compliance with the 90/10 Rule, did not know where the money went after [Debtor] remitted it to Cottingham-Texas." *Id*. at 60. It asserts that the fact that Earle kept the affiliation secret from Ms. Shoffstall, "perhaps the only person who most *needed* to know," is evidence that Earle's knowledge cannot be imputed on Debtor as an entity. *Id*.

*Restructuring, Inc.*, 532 F.3d at 361. However, when reviewing the factual findings that underlie an equitable subordination, courts apply the clearly-erroneous standard. *In re Yorkshire, LLC*, 540 F.3d at 331.

The Bankruptcy Court's factual finding that ASFG "controlled" Cottingham-Texas was not clearly erroneous. As discussed above, Cottingham-Texas merely acted as a strawman designed to funnel money from Debtor to ASFG. Cottingham-Texas was founded at ASFG's request, transacted only with ASFG, and had no revenue other than the funds received from ASFG by way of Debtor. Given that ASFG controlled Cottingham-Texas, the terms of the TLPA do not permit that ASFG was affiliated with Cottingham-Texas. The Court finds that the Bankruptcy Court did not err in finding that ASFG breached the TLPA by representing that it was not affiliated with Cottingham-Texas when, in fact, it was.

ASFG next argues that Section 15.1.7 of the TLPA was not a material provision. ECF No. 18 at 56. It points out that this section could not have been material since Debtor knew about the lending relationship between ASFG and Cottingham-Texas. *Id*. The Trustee responds that the Bankruptcy Court expressly declined to award the Trustee a judgment on its breach of contract claim, so questions of materiality are, to turn a phrase, immaterial. ECF No. 21 at 61. Regardless, the Trustee argues that this provision was material to the parties because a key feature of the Loan Scheme was its purported compliance with the 90/10 Rule. The relationship between ASFG and Cottingham-Texas—which ultimately resulted in tuition loan funds being rerouted back to ASFG through Cottingham-Texas in violation of the 90/10 Rule—thus frustrated the purpose of the Loan Scheme. *Id*. at 61–62.

The Court agrees that materiality was not central to the Bankruptcy Court's opinion such that it would be proper for this Court to comment on upon review. The Bankruptcy Court declined

to award relief to the Trustee on a breach of contract theory—a theory in which materiality would be a relevant issue. However, materiality is not an element of equitable subordination. To equitably subordinate a claim, a court need only find that the claimant has engaged in some kind of inequitable conduct and that the conduct resulted in injury to the creditor. This issue is affirmed.

### b. The Insolvency of Cottingham-Texas

ASFG next argues that no evidence was presented indicating that Cottingham-Texas was insolvent. ECF No. 18 at 57. In fact, because Cottingham-Texas's only liability was the amount owed on the Master Promissory Notes to Debtor—$8,236,787.40—and the Bankruptcy Court permitted garnishment against ASFG because the debt owed by ASFG to Cottingham-Texas exceeded that amount, Cottingham-Texas's assets were greater than its liabilities. *Id*. at 57–58. Further, ASFG asserts it had no legal duty to ensure that Cottingham-Texas was solvent. *Id*. at 58. The Trustee responds that the Bankruptcy Court explicitly noted that "Cottingham-Texas owed money to [Debtor] and ASFG owed Cottingham-Texas a similar amount. . . . [was] not a valuation of Cottingham-Texas's assets and liabilities or analysis of Cottingham-Texas's solvency." ECF No. 18 at 63 (internal citation omitted).

Whether Cottingham-Texas was solvent is a factual finding that warrants clear error review. When laying out the conduct supporting equitable subordination, the Bankruptcy Court notes that ASFG "did not keep Cottingham-Texas solvent and diverted funds from Debtor as it approached bankruptcy." BC Op. at 24. However, this Court is of the opinion that the Bankruptcy Court was not actually referring to the solvency of Cottingham-Texas, but rather to its ability to satisfy its obligations to Debtor. This remark is the only reference to the solvency of Cottingham-Texas in the entire opinion. In contrast, the Bankruptcy Court offered an in-depth analysis of Debtor's insolvency over the span of multiple pages and sections. *See, e.g*., BC Op. at 16, 27–28,

30–34. It stands to reason that it would have spent more than half a sentence analyzing the evidence presented at trial if it were making a factual finding on Cottingham-Texas' solvency.

The more likely explanation, to this Court's mind, is that the Bankruptcy Court was using shorthand to explain how ASFG caused Cottingham-Texas to be unable to satisfy its debt to Debtor. Earlier in the opinion, the Bankruptcy Court explained:

> The monies received by Cottingham-Texas from [Debtor] were returned directly to ASFG. **Cottingham-Texas never had sufficient cash on hand to satisfy its obligations to [Debtor] under the [Master Promissory Notes]**. ASFG was in control of the cash flow of Cottingham-Texas during the entirety of the relevant period. ASFG controlled Cottingham-Texas's investment policies. . . . The Operating Agreement of Cottingham-Texas, which was entered into on May 1, 2013, provided that it would be capitalized with $10,000.00. Cottingham-Texas was never capitalized after it was formed on or about April 25, 2013. Cottingham-Texas never received any funds from anyone other than [Debtor] beyond the initial reimbursement of its formation fee of $1,422.00 from ASFG.

BC Op. at 12 (emphasis added). This Court has already upheld the Bankruptcy Court's finding that ASFG was in control of Cottingham-Texas and caused all of its funds to be diverted to ASFG. The Court will not now disturb those findings. This issue is affirmed.

### c.   Whether ASFG's Conduct was Inequitable as a Matter of Law

ASFG next argues that it should not be punished for demanding that Cottingham-Texas make all payments under the Master Promissory Notes to ASFG after Debtor defaulted on its obligations and approached bankruptcy. It asserts that it was merely "exercising its contractual rights as a secured creditor to receive the payments." ECF No. 18 at 59. The Fifth Circuit has held that a party's exercise of its contractual remedies is not inequitable conduct supporting equitable subrogation. *Id.* (citing *In re Clark Pipe & Supply Co.*, 893 F.2d 693, 701 (5th Cir. 1990)).

The Trustee counters that ASFG no longer had any contractual remedies to exercise once it breached section 15.1.7 of the TLPA. ECF No. 21 at 63. ASFG's material breach of the TLPA

terminated Debtor's obligation to repurchase defaulted student loans. *Id.* It also argues that *In re Clark Pipe & Supply Co.* does not stand for the proposition that ASFG claims it does.

In this Court's view, both arguments overcomplicate the issue. Whether ASFG had a contractual right to engage in the conduct it engaged in is secondary to the purpose of equitable subordination. "The judicially-created doctrine of equitable subordination developed as a policy against fraud and the breach of the duties imposed on a fiduciary of the bankrupt." *Matter of Fabricators, Inc.*, 926 F.2d 1458, 1464 (5th Cir. 1991) (citing *Pepper v. Litton*, 308 U.S. 295, 311 (1939)). This is why courts have long held that fraud is a classic example of inequitable conduct sufficient to satisfy the first prong of the equitable subordination test. *See In re Clark Pipe & Supply Co., Inc.*, 893 F.2d at 699.  "The equitable powers of a bankruptcy court, including the power to subordinate, may be 'invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'" *Matter of Herby's Foods, Inc.*, 2 F.3d 128, 131 (5th Cir. 1993) (quoting *Pepper*, 308 U.S. at 305).

The Master Promissory Notes contain the following clause:

> This Endorsement, Assignment and Pledge of Promissory Note shall also serve as the **written authorization and direction of each of the undersigned to the Borrower hereunder, upon demand by ASFG as the secured party under the Agreement, to make payment to ASFG of all sums due under this Note and all Loans evidenced by this Note** until receipt by Borrower of written notice from ASFG that it has received all delinquent sums due and owing to it by Lenders under the Agreement.

ECF No. 9-10, p. 372, Stipulated fact 32; Trial Exhibit 6 (emphasis added). Although the text of the Master Promissory Notes technically permits ASFG to engage in the allegedly inequitable conduct, that technicality cannot overcome the Bankruptcy Court's finding of actual fraud, as discussed below. Accordingly, this issue is affirmed.

**C. The Bankruptcy Court's rulings on the avoidance of ASFG's lien are affirmed.**

The Bankruptcy Court avoided ASFG's security interest under 11 U.S.C. § 544(b)(1) because it found that ASFG has not paid back to the estate the proceeds of a fraudulent transfer under the Texas Uniform Fraudulent Transfer Act ("TUFTA"). ASFG objects on numerous grounds to this finding:

(1) Bankruptcy Code section 544(b)(1) is not a lien avoidance section;

(2) Plaintiff's complaint did not seek lien avoidance under section 544(b)(1), but rather under section 544(a)(1);

(3) neither section 544(a)(1) nor section 544(b)(1) provide for the avoidance of a lien based on section 502(d);

(4) section 502(d) only applies if a creditor has received an avoidable transfer and, as set forth below, the evidence and the law does not support the Court's avoidance of the payments to purchase defaulted loans; and

(5) Plaintiff did not seek to disallow ASFG's claim under section 502(d) (receipt of an avoidable transfer), but rather under section 502(b)(1) (unenforceable claim against the Debtor).

ECF No. 18 at 61–62. ASFG's argument is that the avoidance of ASFG's lien was improper because "Section 544(b)(1) simply does not provide for the avoidance of a lien based on Bankruptcy Code section 502(d)." *Id*. at 63. Moreover, the Trustee only sought relief under Section 544(a)(1), which permits a trustee to avoid liens that are not properly perfected—a claim that the Bankruptcy Court previously denied. *Id*.

The Trustee responds that the Bankruptcy Court's subordination of ASFG's secured claim permitted the transfer of ASFG's lien to the Debtor's estate. ECF No. 21 at 67 (citing ECF 9-14 at

41 and 11 U.S.C. § 510(c)). It further argues that the lien was avoidable under Section 544(b)(1), which permits the avoidance of "an interest of the debtor in property or any obligation incurred by the debtor," such as a lien. *Id.*

The Court agrees with the Trustee. 11 U.S.C. § 506(d) states "To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void. . . ." This section is automatically triggered whether or not it is affirmatively pled by the Trustee. The Bankruptcy Court avoided ASFG's lien under § 544(b)(1) because it found that ASFG's underlying claim should be disallowed under § 502(d). The latter provision requires a Bankruptcy Court to avoid the claim of a creditor that is found to be, *inter alia*, based on a fraudulent transfer. *See* 11 U.S.C. § 502(d). Because this Court holds below that the Bankruptcy Court did not err in finding ASFG's lien was based on a fraudulent transfer, this issue is affirmed.

**D. The Bankruptcy Court's judgment on Counts 19 and 21 in favor of the Trustee are affirmed.  (Issue 24).**

ASFG next argues that the Bankruptcy Court erred in entering judgment against it for fraudulent conveyance based on an intent to defraud creditors. ECF No. 18 at 63. After the trial, the Bankruptcy Court granted relief on Counts 19 and 21, brought under 11 U.S.C. § 548(a)(1)(A) and 11 U.S.C. § 544 and Texas Business & Commerce Code § 24.005(a)(1), respectively. *See supra*. These statutes codify the avoidance of fraudulent transfers in the bankruptcy context. 11 U.S.C. § 548(a)(1)(A) sets forth the elements of a fraudulent conveyance involving actual fraud (as opposed to constructive fraud) under federal law, and Texas Business & Commerce Code § 24.005(a)(1) codifies its Texas counterpart. Though each test is slightly different, both require proof that (1) a debtor transferred its property and (2) the transfer was made with an intent to hinder, delay, or defraud one of the debtor's creditors. *Compare* 11 U.S.C. § 548(a)(1)(A) (setting forth the elements under the Bankruptcy Code) *with Nwokedi v. Unlimited Restoration Specialists,*

*Inc.*, 428 S.W.3d 191, 204–05 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (describing the elements under state law).

ASFG first argues that a fraudulent transfer under § 548(a)(1) must be made by the debtor and must involve property of the debtor, and that did not happen here. ECF No. 18 at 64. According to ASFG, all of the payments received by ASFG were transfers from Edudyne, not Debtor. *Id.* ASFG further contends that the Bankruptcy Court erred in finding that ASFG intended to defraud the DoE when the fraudulent transfer test requires proof that the debtor intend the fraud. *Id.* at 67 (citing 11 U.S.C. § 548(a)(1)(A)). It asserts that no evidence of the Debtor's intent to defraud the DoE was presented at trial. *Id.*

The Trustee responds that ASFG failed to raise the theory that Edudyne's role in the Loan Scheme was of legal significance at trial, so that argument is waived. ECF No. 21 at 69 (citing *AG Acceptance Corp. v. Veigel*, 564 F.3d 695, 701 (5th Cir. 2009)). In the alternative, the Trustee argues that it presented evidence at trial that Edudyne was merely a middleman through which funds were funneled from Debtor to ASFG. *Id.* at 69–70 (citing ECF No. 14-3 at 205:10–14; 216:13–16). On the matter of intent, the Trustee points out that the Bankruptcy Court properly held that actual intent was evident from the "badges of fraud" that it found present in the transfers "coupled with ASFG and Earle's brazen efforts to evade federal caps on funding sources." *Id.* at 70–71 (citing ECF No. 9-14 at 49). It further argues that a transferee's intent can be imputed on the transferor when the transferee is in a position to dominate or control the debtor's disposition of the property. *Id.* at 71 (citing *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 442–43 (S.D.N.Y. 2001); *In re L & D Interests, Inc.*, 350 B.R. 391, 400 (Bankr. S.D. Tex. 2006)).

As ASFG points out in its reply brief, it appears that ASFG did raise the issue of whether transfers made through Edudyne were transfers made by Debtor in order to support a finding of a

fraudulent transfer. ECF No. 22 at 21–23 (citing ECF No. 9-2 at 133–34; ECF No. 9-10 at 1042; ECF No. 9-10 at 1200). Thus, the Court cannot find that ASFG waived that issue.

On appeal, the Court reviews the Bankruptcy Court's conclusions of law *de novo* and its findings of fact under a clear-error standard. *In re National Gypsum Co.*, 208 F.3d at 503. Whether a transfer made through a third party can ever be considered a transfer made by a debtor in this context is a question of law. Whether the evidence presented at trial supports the Bankruptcy Court's finding of a fraudulent transfer is a question of fact.

As a matter of law, third-party transfers can be sufficient to permit a trustee to recover transfers of "an interest of the debtor in property" under certain circumstances. 11 U.S.C. § 544(b). For the purposes of fraudulent transfers, a debtor's interest in property "is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier v. I.R.S.*, 496 U.S. 53, 59 (1990). 11 U.S.C. § 541(a)(1) states that such "property of the estate" includes "all legal or equitable interests of the debtor in property." Section 541 "is generally interpreted broadly in accordance with the statutory language." *Wilson v. United Sav. of Tex. (In re Missionary Baptist Found. of Am., Inc.)*, 792 F.2d 502, 504 (5th Cir. 1986). "The nature and extent of the debtor's interest in property is analyzed by reference to the applicable state law." *Id.*; *Butner v. U.S.*, 440 U.S. 48, 55 (1979). Thus, courts apply a two-step analysis in determining whether a transfer is of "an interest of the debtor in property": (1) the nature of the debtor's interest in the transferred asset under applicable state property law; and (2) whether the state-law defined property interest becomes "property of the estate" under the Bankruptcy Code. *In re IFS Fin. Corp.*, 417 B.R. 419, 434 (Bankr. S.D. Tex. 2009), *aff'd sub nom. IFS Fin. Corp. v. Garcia Suarez*, H-09-CV-3059, 2010 WL 11652027 (S.D.

Tex. Sept. 11, 2010), *aff'd sub nom. In re IFS Fin. Corp.*, 803 F.3d 195 (5th Cir. 2015) and *subsequently aff'd*, 669 F.3d 255 (5th Cir. 2012).

Here, Texas law applies. Although the transfers of funds at issue were made from Edudyne to ASFG, it is not necessarily the case that Debtor had no interest in the funds that were transferred. "The Texas Supreme Court has held that the true owner of funds in an account is not necessarily the legal owner, but the party who 'is found in the full possession and control of the money deposited.'" *Id*. at 435 (quoting *Silsbee State Bank v. French Mkt. Grocery Co*., 103 Tex. 629, 132 S.W. 465, 466 (1910)). The Fifth Circuit has likewise held that the owner of property is determined by possession and control. It explained:

> If the debtor determines the disposition of funds from the third party and designates the creditor to be paid, the funds are available for payment to creditors in general and the funds are assets of the estate. In this event, because the debtor controlled the funds and could have paid them to anyone, the money is treated as having belonged to her for purposes of preference law whether or not she actually owns it.

*Caillouet v. First Bank & Trust (In re Entringer Bakeries, Inc.)*, 548 F.3d 344, 350 (5th Cir. 2008) (quoting 1 David G. Epstein Et Al., Bankruptcy § 6–7, at 522 (1992)). Further, "[n]umerous courts have applied the de facto ownership concept to hold that property of a debtor's estate includes funds that the debtor controlled, despite the fact that another party had legal title to the funds." *In re IFS Fin. Corp*., 417 B.R. at 436 (collecting cases). Accordingly, the Bankruptcy Court was not precluded as a matter of law from concluding that a fraudulent transfer occurred simply because the transfer was made by Edudyne, rather than Debtor.

Next, the Court turns to whether the Bankruptcy Court's finding that the transfers made by Edudyne were transfers of the property interest of the Debtor was clearly erroneous. The Bankruptcy Court stated that each of the Trustee's fraudulent transfer claims were "based on sums Debtor paid ASFG to repurchase defaulted student loans which ASFG 'put' back to Debtor over

the course of the transaction, between November 2013 and October 31, 2016 when Debtor filed for bankruptcy." BC Op. at 27. Later, it explained:

> [I]t is helpful to think of the repurchase obligation in the context of the larger transaction. For each loan that defaulted, Debtor had already paid ASFG through Cottingham-Texas at least half the value of the loan, then was obligated to pay full price for the defaulted loan before receiving the loan or triggering any repayment obligation by ASFG. To make matters worse, Debtor's right to repayment of the deposit was pledged as collateral for the repurchase obligation. Essentially, a defaulted loan yields a 150% recovery for ASFG, which retained no risk for the defaulted loan but did retain the cash Debtor lent back to it through Cottingham-Texas. . . . Debtor was required to pay full price for all outstanding repurchase obligations before receiving any of the loans it was purportedly repurchasing.

BC Op. at 29–30.

At trial, the Trustee's forensic accountant, Greg Murray, testified that his analysis showed a scheme in which money was funneled from Debtor to ASFG through Edudyne. *See* ECF No. 14-3 at 205, 216. Further, the uncontroverted evidence at trial showed that Lawrence Earle and Debtor entered into the TLPA and APPAs with the understanding that it undertook recourse loan obligations in which payments would ultimately go to ASFG as recourse loan holder in the event of a default. *See supra* Part A. Likewise, numerous ASFG executives testified that the Loan Scheme was designed to transfer funds from Debtor to ASFG without the DoE's knowledge. *See e.g.*, ECF No. 14-3 at 77, 110, 117, 164. The Court holds that the Bankruptcy Court's factual findings of a transfer of the Debtor's property and the intent to defraud Debtor's creditors were not clearly erroneous. The Court affirms on this issue.

### E. The Bankruptcy Court's ruling that ASFG did not operate in good faith is affirmed. (Issues 9–11 and 17–18).

ASFG next argues that it proved its good faith defense. The issues raised on appeal are:

9.   Did the Bankruptcy Court err in finding that the Debtor and ASFG entered into the TLPA and the APPA with the intent to defraud the Debtor's creditors?

10.     Did the Bankruptcy Court err in finding that "Both CPC's principal, Lawrence Earle, and ASFG actively concealed that the payments to Cottingham-Texas were merely deposits placed with ASFG to secure its lending to CPC's students"?

11.     Did the Bankruptcy Court err in finding that "ASFG 'concealed,' at least from federal reporting, that Cottingham-Texas was not independent"?

17.     Did the Bankruptcy Court err in finding that ASFG did not operate in good faith?

18.     Did the Bankruptcy Court err in finding that ASFG did not receive the payments for the purchase of defaulted loans in good faith?

ASFG begins by arguing that the Bankruptcy Court's finding of a lack of good faith is based on the erroneous finding that the PSLs violated the 90/10 Rule. This argument fails because the Court has already concluded that the PSLs *did* violate the 90/10 Rule. ASFG next argues that the evidence did not support the Bankruptcy Court's finding that ASFG concealed its affiliation with Cottingham-Texas from the DoE because there was no evidence that ASFG ever had any contact with the DoE. ECF No. 18 at 70. It also points out that Timothy Duoos, CEO of ASFG, testified that ASFG was not involved in a scheme to defraud the DoE. *Id*. at 70–71 (citing ECF No. 14-5 at 34–35).

The Court first notes that the Bankruptcy Court is entitled to disregard the testimony of a witness that it does not find credible. *M/V ANTWERPEN*, 465 F.3d at 259. Although the Bankruptcy Judge made no explicit finding that Duoos' testimony was not credible, it is reasonably likely that it did not credit his testimony, given its holding that ASFG was involved in a scheme to defraud the government. Duoos, as CEO of ASFG, had a vested interest in the outcome of the Bankruptcy, and it is not error to take into account the self-serving nature of his testimony. Likewise, the Bankruptcy Court was within its discretion to find that Duoos' testimony was outweighed by the testimony supporting a finding of bad faith presented at trial. *See e.g*., ECF No.

14-3 at 77–78, 110; ECF No. 14-4 at 164–65). Its finding of fact was not clearly erroneous. *In re National Gypsum Co.*, 208 F.3d at 503. These issues are affirmed.

**F.  The Court declines to opine on Issues 12, 13, and 16.**

ASFG next argues that the evidence presented at trial did not support an avoidance of fraudulent transfer under 11 U.S.C. § 548(a)(1)(B). The relevant issues are:

> 12.  Did the Bankruptcy Court err in admitting the opinion testimony of Greg Murray with regard to the value of assets on the Debtor's financial statements when Mr. Murray testified that he has no expertise in valuation?

> 13.  Did the Bankruptcy Court err in finding that the Debtor was insolvent based on the opinion testimony of an accountant who based his opinion on the Debtor's financial statements without any evidence of the fair value of the Debtor's assets?

> 16.  Did the Bankruptcy Court err in finding that the Debtor did not receive reasonably equivalent value for the defaulted loans that it purchased from ASFG?

To recover previously conveyed assets for the benefit of the Bankruptcy Estate under § 548 based on a theory of constructive fraud, a bankruptcy trustee must prove that the debtor "both (a) 'received less than a reasonably equivalent value in exchange' for the transfer and (b) 'was insolvent on the date that such transfer was made . . . or became insolvent as a result of' the transfer." *United States v. Theall*, 609 F. App'x 807, 813 (5th Cir. 2015) (citing 11 U.S.C. § 548(a)(1)(A)–(B)). The Trustee brought Counts 20, 22, and 23 under this theory of constructive fraud as an alternative method of securing the same relief it would have received if it had succeeded on its claims for actual fraud. As the Bankruptcy Court noted, each of the Trustee's claims were "based on sums Debtor paid ASFG to repurchase defaulted student loans which ASFG 'put' back to Debtor over the course of the transaction, between November 2013 and October 31, 2016 when Debtor filed for bankruptcy." BC Op. at 27. The court granted relief on both constructive and actual fraud theories, but held that the "Trustee is entitled to only one satisfaction" due to the

alternative rationales for achieving the same result. *Id*. Because this Court has already affirmed the Bankruptcy Court's finding of actual fraud, opining on these arguments would be fruitless. The Court will express no opinion on the merits of ASFG's constructive fraud arguments.

### G. ASFG's remaining arguments.

ASFG makes two final arguments. First, it argues that the Court should overturn the disallowance of ASFG's claim if it reverses on the Bankruptcy Court's judgment against ASFG for fraudulent conveyance. ECF No. 18 at 89–90. Second, it urges the Court to reverse the Bankruptcy Court's adverse rulings in the consolidated appeals—Case Nos. 5:19-cv-1237 and 5:19-cv-1238. *Id*. at 90. Because this Court affirms the Bankruptcy Court's fraudulent transfer judgment, it will not now reverse the disallowance of ASFG's claim. Likewise, because the Court affirms on all issues presented in this appeal, the Court will not grant contrary relief in the consolidated appeals.

To the extent that issues were raised on appeal but not addressed by specific enumeration, the Bankruptcy Court's rulings are affirmed.

### CONCLUSION

For the reasons stated herein, the decisions of the Bankruptcy Court are **AFFIRMED**. The Court Clerk is **DIRECTED** to close the appeals in the following cases:

> 5:19-cv-1237-XR
> 5:19-cv-1238-XR
> 5:20-cv-580-XR

It is so **ORDERED.**

**SIGNED** this 9th day of August, 2021.

_____
Xavier Rodriguez
United States District Judge